AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>FERNANDO ALFREDO PAEZ-LAZCANO, and<br>MARCO ANTONIO MORA-REYNOSA<br>*MORA-*<br><br>*Defendant(s)* | Case No. 4-15-71198 MAG |

**FILED**
SEP 15 2015
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __September 13, 2015__ in the county of __Contra Costa__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846, 841(b)(1)(A)(viii) | Conspiracy to Possess with Intent to Distribute, and Distribute, 500 Grams or More of a Mixture and Substance Containing Methamphetamine |

Approved as to form: ___[signature]___
AUSA GARTH HIRE

Penalties:
(1) Imprisonment: Maximum Life Prison, Mandatory Minimum 10 Years
(2) Fine: Maximum $10,000,000
(3) Supervised Release: Maximum Life, Mandatory Minimum 5 Years
(4) Special Assessment: $100

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT.

☑ Continued on the attached sheet.

___[signature]___
*Complainant's signature*

Mickel Sexton, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/14/15

___[signature]___
*Judge's signature*

City and state: Oakland, California    Hon. Kandis A. Westmore, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Mickel Sexton, being duly sworn, declare as follows:

## INTRODUCTION

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Justice Department, and have been so employed since September 21, 2012. I am at present assigned to the ATF Oakland Field Office in Oakland, California. I am an investigative or law enforcement officer of the United States within the meaning of U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrest for offenses enumerated in 18 U.S.C. § 2516.

2. As an ATF SA, I have conducted and participated in investigations of narcotics trafficking and illegal firearms possession and sale. During these investigations, I have utilized, or participated in investigations that utilized, various types of investigative techniques, including electronic surveillance pursuant to court-authorized wiretaps; undercover agents and informants; controlled purchases of firearms and narcotics from suspects; physical surveillance, consensual recording, and investigative interviews. I have participated in the execution of numerous state and federal arrest warrants and search warrants.

3. My beliefs, conclusions, and opinions set forth throughout this affidavit are based on my experience and training, as well as the training and experience of other agents, deputies, and officers assisting in this investigation, my familiarity with the methods used by narcotics traffickers to import, manufacture, and distribute illegal narcotics and collect and launder the proceeds from the sales of illegal narcotics, and conversations with other law enforcement personnel familiar with this investigation and/or the methods of operation utilized by narcotics traffickers.

## PURPOSE OF AFFIDAVIT

4. I make this affidavit in support of a criminal complaint and arrest warrants charging Fernando Alfredo Paez-Lazcano (PAEZ-LAZCANO) and Marco Antonio Mora-Reynosa (MORA-REYNOSA) with conspiracy to possess with intent to distribute, and to distribute, methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii).

5.  The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, my review of documents and/or reports related to this investigation, communications with others who have personal knowledge of the events and the circumstances described herein, and knowledge gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint and arrest warrants, as well as a search warrant, it does not set forth each and every fact that I, or others, have learned during the course of the investigation. All dates, times, and quantities of narcotics are approximate.

**PROBABLE CAUSE**

6.  On August 8, 2015, ATF SA who later acted in an undercover capacity (UC) received information from a confidential informant (who was being compensated for his/her assistance) that an individual from whom the CI had previously purchased methamphetamine had moved to Northern California. On August 15, 2015, the CI contacted PAEZ-LAZCANO and referenced the acquisition of quantities of methamphetamine from PAEZ-LAZCANO. PAEZ-LAZCANO indicated he had an associate able to supply quantities of methamphetamine.

7.  On August 10, 2015, ATF SA Johnson queried the phone number the CI provided and identified PAEZ-LAZCANO as the individual who the phone was registered to according to a public records database. The UC instructed the CI to contact PAEZ-LAZCANO to arrange the purchase of a quarter (1/4) pound of methamphetamine to a friend (the UC). On this date, the CI arranged for the UC to purchase four (4) ounces of methamphetamine from PAEZ-LAZCANO. The meeting and transaction was planned to take place in a parking lot located at 2370 Monument Boulevard in Concord, California (the Concord Parking Lot). The CI indicated that the price for the four (4) ounces of methamphetamine would be $1200.00 ($300.00 per ounce).

8.  At 1:34 pm, the UC arrived at the meet location. At 2:11 pm, the UC greeted PAEZ-LAZCANO who had walked over to the UC's vehicle. The UC observed PAEZ-LAZCANO carrying a disposable "Coca-Cola" cup in his hand. The UC then told PAEZ-LAZCANO that he had heard (from the CI) that the one (1) pound of methamphetamine that the UC was originally supposed to purchase was of poor quality (shake) and was not good. The UC then asked if that was going to be a

2

1 problem (getting good quality methamphetamine from PAEZ-LAZCANO) on any future transactions.
2 PAEZ-LAZCANO stated it was not going to be a problem since he was going to travel to Los
3 Angeles since he had "people" (which the UC understood to mean sources of supply) there. PAEZ-
4 LAZCANO further stated that he was originally from Los Angeles but was now relocating up here
5 (which the UC understood to mean Northern California) and that a lot of people were asking for "it"
6 (which the UC understood to mean methamphetamine).

7       9.     PAEZ-LAZCANO then handed the UC that disposable "Coca-Cola" cup and the UC
8 observed that it contained two clear plastic baggies of suspected methamphetamine. The UC placed
9 the disposable "Coca-Cola" cup on the center counsel of the UC vehicle. The UC then retrieved the
10 $1,200.00 in government funds from his left pants pocket and counted it and handed it to PAEZ-
11 LAZCANO for the four (4) ounces of suspected methamphetamine that was contained in the
12 disposable "Coca-Cola" cup. The UC told PAEZ-LAZCANO to recount the money and the UC
13 observed him take possession of it. The UC asked PAEZ-LAZCANO if there were a lot of people
14 "moving weight" (by which the UC meant selling large quantities of narcotics) up in the area. PAEZ-
15 LAZCANO replied that there were but that he only likes to deal with family members as his sources.
16 PAEZ-LAZCANO also stated that once his father gets released from prison for cocaine trafficking,
17 PAEZ-LAZCANO would be able to supply The UC with pound quantities of methamphetamine for
18 $2,700.00 to $2,800.00 per pound. PAEZ-LAZCANO told the UC that his father would be getting
19 released from prison next month. On August 15, 2015, I utilized a Narcotics Identification Kit to
20 conduct a field test on the suspected methamphetamine. The field test confirmed a positive presence
21 for methamphetamine.

22      10.    On August 17, 2015, the UC made arrangements to purchase one (1) pound of
23 methamphetamine and a firearm from PAEZ-LAZCANO in the Concord Parking Lot. PAEZ-
24 LAZCANO stated the price for the one (1) pound of methamphetamine would be $3,700.00 and
25 approximately $500.00 to $600.00 for the handgun. On the same date, at 2:31 pm, the UC placed a
26 text message to PAEZ-LAZCANO. The UC advised PAEZ-LAZCANO that he was at the meet
27 location. After a brief period of time, the UC observed PAEZ-LAZCANO walking through the
28 parking lot towards the UC vehicle. The UC observed PAEZ-LAZCANO carrying a black nylon bag

that was secured around his neck. PAEZ-LAZCANO entered the UC vehicle and sat in the front passenger seat next to the UC.

11. The UC asked PAEZ-LAZCANO if the person who was going to be delivering the one (1) pound of methamphetamine was actually related to PAEZ-LAZCANO or was just an associate. The UC stated that he was concerned he may be getting "set up" since he would be dealing with a new person and that the CI had only vouched for PAEZ-LAZCANO. PAEZ-LAZCANO stated he had the same concerns and that he told the CI that if something was to go wrong (in dealing with the UC) that PAEZ-LAZCANO would "come looking" for the CI. PAEZ-LAZCANO then stated that he was so nervous that he arrived early to the meet location and had been driving around the parking lot and observed a gray Ford Escape with a lone driver that had been sitting in the parking lot for some time. The UC stated that PAEZ-LAZCANO doesn't have to worry about him/her and again stated that the CI had only vouched for PAEZ-LAZCANO. PAEZ-LAZCANO told the UC not to worry and that the UC would only be dealing with PAEZ-LAZCANO. PAEZ-LAZCANO further stated that his main supplier was his uncle but that he had been told by his uncle that he needed to deal with the UC for four months before he would start supplying him. PAEZ-LAZCANO stated that he had to go to his cousin to get the one (1) pound of methamphetamine for this deal and that his uncle only deals in large quantities.

12. The UC told PAEZ-LAZCANO that they needed to take it slow in their dealings so they can build up trust. PAEZ-LAZCANO agreed and stated that was why he didn't bring any firearms to sell to the UC for this deal since PAEZ-LAZCANO was nervous. The UC stated that he/she would pay $3,700.00 for the one (1) pound of methamphetamine this time but wanted to know when the price would go down. PAEZ-LAZCANO stated that once he starts getting supplied from his uncle, the prices will go down. PAEZ-LAZCANO further stated that his father wants him to wait until he gets released from prison so that he can start supplying PAEZ-LAZCANO directly. PAEZ-LAZCANO stated that his father wanted him to handle and sell ten to twenty pounds of methamphetamine per week.

13. PAEZ-LAZCANO then asked the UC, "How much can you take a week?" The UC replied that twenty pounds per week may be too much for the UC but that he could handle ten to

4

1 fifteen pounds if the price was right. The UC stated that he/she was looking to establish a long term
2 business relationship with PAEZ-LAZCANO and PAEZ-LAZCANO replied, "me too". PAEZ-
3 LAZCANO stated that he only wanted to deal with two buyers and that the other buyer he dealt with
4 was a friend he had known since middle school. The UC then observed PAEZ-LAZCANO retrieve a
5 clear plastic wrapped bundle of suspected methamphetamine from the black bag that the UC had
6 observed PAEZ-LAZCANO carrying. The UC reached over and felt the bundle of suspected
7 methamphetamine and then instructed PAEZ-LAZCANO to place it into a hidden compartment
8 within the UC vehicle. The UC then retrieved the U.S. government funds from his/her pants pocket
9 and counted out $3,700.00 and handed it to PAEZ-LAZCANO. The UC observed PAEZ-LAZCANO
10 recount the U.S. government funds and place it into the black bag. The UC asked PAEZ-LAZCANO
11 if the UC was going to be able to purchase firearms from him. PAEZ-LAZCANO stated yes and
12 again stated that he did not bring any with him for this deal since he was nervous but would sell
13 firearms to the UC on a later date.

14. The UC then asked PAEZ-LAZCANO if he always carried a firearm during his
15 narcotics dealings. PAEZ-LAZCANO replied that he does on the first five to ten times he deals with
16 people he does not know but that he does not carry it on his person but keeps it in his vehicle. PAEZ-
17 LAZCANO then asked the UC if methamphetamine was the only thing the UC was interested in
18 buying. PAEZ-LAZCANO further stated that he had a supplier for black tar heroin as well. The UC
19 stated he would need to talk to some people to see if they were interested and to give the UC prices
20 and quantities that PAEZ-LAZCANO could supply. PAEZ-LAZCANO then stated that his father
21 could supply kilogram quantities of cocaine at a price of $25,000.00 per kilogram if the UC was
22 interested. PAEZ-LAZCANO stated that he would be able to supply the UC additional pound
23 quantities of methamphetamine on the following Monday. The UC again inquired about purchasing
24 firearms from PAEZ-LAZCANO. PAEZ-LAZCANO stated that firearms were much cheaper in
25 price up here (which the UC understood to mean Northern California) as compared to Los Angeles.
26 PAEZ-LAZCANO stated if he got the firearms before Friday he would call the UC and that they
27 would be a 9mm and .40 caliber and would cost $500.00 to $600.00 each. The meeting was
28 terminated and the UC observed PAEZ-LAZCANO exit the UC vehicle. On this date, SA Keen

utilized a Narcotics Identification Kit to conduct a field test on the suspected methamphetamine. The field test confirmed a positive presence for methamphetamine.

15. On August 24, 2015, the UC met with PAEZ-LAZCANO at the Concord Parking Lot. PAEZ-LAZCANO entered the UC vehicle and provided the UC with two ounces of heroin and a loaded 9mm, Hi-Point, semi-automatic pistol, Model C9, bearing serial number P1756206, in exchange for cash.

16. On September 1, 2015, the UC met with PAEZ-LAZCANO at the Concord Parking Lot. PAEZ-LAZCANO entered the UC vehicle and provided the UC with one ounce of heroin and a Smith & Wesson, model 19-5, .357 caliber revolver, bearing serial number ADR4275, in exchange for cash.

17. Following the controlled purchase of heroin and a firearm on September 1, 2015, the UC and PAEZ-LAZCANO continued discussions regarding the sale of a large quantity of methamphetamine to the UC. Eventually, PAEZ-LAZCANO agreed to sell the UC ten pounds of methamphetamine in exchange for $34,000.

18. On September 13, 2015, the UC arranged to meet with PAEZ-LAZCANO at a Walgreen's parking lot in Concord and then eventually they traveled separately to a second location. At the second a location, PAEZ-LAZCANO exited his vehicle along with a second individual subsequently identified as MORA-REYNOSA.

19. MORA-REYNOSA introduced himself as "Marco" and the UC asked if MORA-REYNOSA if the UC was going to be dealing with MORA-REYNOSA. The UC then asked if the UC was going to be seeing and dealing with MORA-REYNOSA all the time as well and MORA-REYNOSA replied, "Yes". PAEZ-LAZCANO told the UC that MORA-REYNOSA travels with him every time he goes down to Los Angeles. MORA-REYNOSA stated that he lives with PAEZ-LAZCANO as well. The UC stated that he just didn't want to be meeting or dealing with any new people other than PAEZ-LAZCANO and MORA-REYNOSA. MORA-REYNOSA told the UC that PAEZ-LAZCANO did not want to bring him to meet with the UC until PAEZ-LAZCANO called and checked with the UC first. The UC said that was good since the UC trusted PAEZ-LAZCANO and PAEZ-LAZCANO trusts MORA-REYNOSA.

20. The UC told PAEZ-LAZCANO to show him where the methamphetamine was concealed inside PAEZ-LAZCANO's vehicle and how to access it. PAEZ-LAZCANO asked the UC when he could get back his vehicle (PAEZ-LAZCANO wanted to temporarily exchange his vehicle with the methamphetamine concealed inside with the UC's UC vehicle). The UC asked when he needed his vehicle back. MORA-REYNOSA told the UC that it would only take him five minutes to retrieve the methamphetamine from the hidden location within PAEZ-LAZCANO's vehicle. The UC told PAEZ-LAZCANO and MORA-REYNOSA to go ahead and retrieve the methamphetamine and that they didn't need to worry about any cameras being at the location where they were at.

21. MORA-REYNOSA told PAEZ-LAZCANO to open the trunk so he could get some tools. The UC stated he thought the methamphetamine was concealed in a location within the vehicle that made it very difficult to retrieve. MORA-REYNOSA stated, "You cannot even tell it is in there" the UC asked if the problem they had with concealing the methamphetamine was that it wouldn't fit in a normal "clavo" (by which the UC meant a hidden compartment). PAEZ-LAZCANO stated that since the pound quantities were in "tupper ware" containers that made it difficult to put into the hidden compartment. MORA-REYNOSA told the UC that was the way they received the methamphetamine today.

22. As the UC observed MORA-REYNOSA removing the panel on the rear passenger door, the UC asked if they typically concealed narcotics in the doors of vehicles. The UC observed MORA-REYNOSA utilizing a screw driver and socket wrench to remove the panel off the door which revealed numerous plastic wrapped packages. The UC asked PAEZ-LAZCANO if he had a "clavo" in the dash board area of his vehicle and how much would it hold. PAEZ-LAZCANO responded he did and that it could hold six kilograms.

23. The UC observed MORA-REYNOSA pulling back the panel of the door and the UC asked if the location within the door could hold all ten pounds of methamphetamine and PAEZ-LAZCANO responded, "Yes". MORA-REYNOSA began to remove the plastic wrapped packages from inside the door and then asked, "where are we gonna put em." The UC stated that he was going to take the methamphetamine to his UC vehicle and then asked if PAEZ-LAZCANO had a bag he

7

could utilize. PAEZ-LAZCANO stated he did and then retrieved a red and white paper bag from the back seat area of his vehicle and handed it to MORA-REYNOSA.

24. The UC asked PAEZ-LAZCANO if MORA-REYNOSA was going to be coming by himself on any future dealings with the UC. PAEZ-LAZCANO replied he would if PAEZ-LAZCANO was not available. The UC told MORA-REYNOSA he thought it was only going to take him five minutes to retrieve the methamphetamine and PAEZ-LAZCANO responded MORA-REYNOSA has to remove the door panel. MORA-REYNOSA then stated that there were only two more screws he needed to remove to get the door panel off completely. The UC then told PAEZ-LAZCANO that he was going to walk over to the UC vehicle to bring him back the money for the methamphetamine purchase. PAEZ-LAZCANO and MORA-REYNOSA were then taken into custody without incident.

25. PAEZ-LAZCANO was advised of his <u>Miranda</u> rights and agreed to speak with agents. PAEZ-LAZCANO made the following statements, among others. PAEZ-LAZCANO stated that MORA-REYNOSA is a friend who lives with PAEZ-LAZCANO. PAEZ-LAZCANO stated that MORA-REYNOSA did not know that there were ten pounds of methamphetamine in PAEZ-LAZCANO's vehicle. PAEZ-LAZCANO admitted, however, that MORA-REYNOSA, was present when the ten pounds of methamphetamine were loaded into the hidden compartment in the vehicle. PAEZ-LAZCANO admitted selling the methamphetamine, heroin, and firearms on August 15, August 17, August 24, and September 1, 2015. PAEZ-LAZCANO stated that when he previously told the UC that he was selling narcotics to another individual he was not truthful.

26. MORA-REYNOSA was advised of his <u>Miranda</u> rights and agreed to speak with agents. MORA-REYNOSA made the following statements, among others. MORA-REYNOSA stated that he and PAEZ-LAZCANO met with a female at a gas station in Los Angeles and the female gave them a bag that they then drove to PAEZ-LAZCANO's brother's house. An individual at the house gave them the tools to dismantle the door of PAEZ-LAZCANO's vehicle and showed MORA-REYNOSA the screws that would need to be removed. MORA-REYNOSA admitted that he knew that it was methamphetamine that was hidden inside the vehicle. MORA-REYNOSA said that he was not going to be paid as a result of the sale of the methamphetamine.

27. The gross weight (including packaging) of all of the methamphetamine seized from the vehicle occupied by PAEZ-LAZCANO and MORA-REYNOSA was 4,922 grams. A portion of the methamphetamine was field-tested and was positive for the presence of methamphetamine.

**CONCLUSION**

28. Based on the above, I believe there is probable cause to believe that Fernando Alfredo Paez-Lazcano and Marco Antonio Mora-Reynosa conspired to possess with intent to distribute, and to distribute, methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii), and I respectfully request that the Court sign the requested criminal complaint and issue the requested arrest warrants.

_____
MICKEL SEXTON
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Subscribed to and sworn before me
this 14 day of September 14, 2015.

_____
HONORABLE KANDIS A. WESTMORE
UNITED STATES MAGISTRATE JUDGE

9

AO 257 (Rév. 6/78)

| DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT |
|---|

BY: ☒ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT  ☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location
**NORTHERN DISTRICT OF CALIFORNIA**
OAKLAND DIVISION

FILED
SEP 14 2015

--- OFFENSE CHARGED ---

21 U.S.C. § 846, 841(b)(1)(A)(viii) - Conspiracy to Possess with Intent to Distribute, and Distribute, 500 Grams or More of a Mixture and Substance Containing Methamphetamine

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

PENALTY: Imprisonment: Maximum Life Prison, Mandatory Minimum 10 Years
Fine: Maximum $10,000,000
Supervised Release: Maximum Life, Mandatory Minimum 5 Years
Special Assessment: $100

DEFENDANT - U.S

▶ FERNANDO ALFREDO PAEZ-LAZCANO

DISTRICT COURT NUMBER

4-15-71198

--- PROCEEDING ---

Name of Complaintant Agency, or Person (& Title, if any)
Bureau of Alcohol, Tobacco, Firearms and Explosives

☐ person is awaiting trial in another Federal or State Court, give name of court
_____

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District
_____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE
SHOW DOCKET NO. _____

☐ this prosecution relates to a pending case involving this same defendant
MAGISTRATE CASE NO. _____

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under _____

Name and Office of Person Furnishing Information on this form   BRIAN J. STRETCH
☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   GARTH HIRE, AUSA

--- DEFENDANT ---

**IS NOT IN CUSTODY**
1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶ _____
2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)
_____

**IS IN CUSTODY**
4) ☒ On this charge
5) ☐ On another conviction  ☐ Federal  ☐ State
6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution _____

Has detainer been filed?  ☐ Yes  ☐ No   If "Yes" give date filed _____

DATE OF ARREST ▶ Month/Day/Year _____
Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶ Month/Day/Year _____

☐ This report amends AO 257 previously submitted

--- ADDITIONAL INFORMATION OR COMMENTS ---

PROCESS:
☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT   Bail Amount: No Bail

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance
Defendant Address:
_____

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____   Before Judge: _____

Comments:

AO 257 (Rev. 6/78)

| DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT |
|---|

BY: ☒ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT  ☐ SUPERSEDING

**OFFENSE CHARGED**

21 U.S.C. § 846, 841(b)(1)(A)(viii) - Conspiracy to Possess with Intent to Distribute, and Distribute, 500 Grams or More of a Mixture and Substance Containing Methamphetamine

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

PENALTY: Imprisonment: Maximum Life Prison, Mandatory Minimum 10 Years
Fine: Maximum $10,000,000
Supervised Release: Maximum Life, Mandatory Minimum 5 Years
Special Assessment: $100

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

FILED
SEP 14 2015
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

**DEFENDANT - U.S**
MARCO ANTONIO MORA-MOYA-REYNOSA

DISTRICT COURT NUMBER
4-15-71198 MAG

**PROCEEDING**

Name of Complaintant Agency, or Person (& Title, if any)
Bureau of Alcohol, Tobacco, Firearms and Explosives

☐ person is awaiting trial in another Federal or State Court, give name of court _____

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District _____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
  ☐ U.S. ATTORNEY  ☐ DEFENSE

SHOW DOCKET NO. _____

☐ this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO. _____

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under _____

Name and Office of Person Furnishing Information on this form   BRIAN J. STRETCH
☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   GARTH HIRE, AUSA

**DEFENDANT**

IS *NOT* IN CUSTODY
  Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

IS IN CUSTODY
4) ☒ On this charge
5) ☐ On another conviction  } ☐ Federal  ☐ State
6) ☐ Awaiting trial on other charges
   If answer to (6) is "Yes", show name of institution _____

Has detainer been filed?  ☐ Yes  ☐ No   } If "Yes" give date filed _____

DATE OF ARREST ▶ Month/Day/Year _____
Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶ Month/Day/Year _____

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

PROCESS:
☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT     Bail Amount: No Bail

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance
Defendant Address: _____

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____   Before Judge: _____

Comments: